**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF WISCONSIN**
_____

**JOE SANFELIPPO CABS INC.,**
**GCC INC., ROY WMS INC.,**
**FRENCHY CAB CO INC., and**
**2 SWEETS INC.,**
                  **Plaintiffs,**

**v.**                                                                                                     **Case No. 14-CV-1036**

**CITY OF MILWAUKEE,**
                  **Defendant.**
_____

## **DECISION AND ORDER**

Plaintiffs, taxicab companies which own taxicab vehicle permits in the City of Milwaukee, challenge the constitutionality of a new city ordinance that removes the cap on the number of taxicab permits issued by the City and regulates new so-called rideshare companies like Uber and Lyft. Plaintiffs allege that parts of the ordinance violate their Fourteenth Amendment rights to substantive due process and equal protection and seek a preliminary injunction.

### **I. Background**

For decades, the City of Milwaukee has capped the number of taxicab permits issued each year. Prior to 1992, the taxicab ordinance required the City to find "that the public welfare, safety, convenience and necessity require" a change in the number of permits. M.C.O. 100-5 (1991). Pursuant to this requirement, the City held annual adequacy hearings to determine whether additional permits were needed and to issue such permits. Prompted in part by a disposition to eliminate these hearings, the City revised the ordinance effective in 1992 barring the issuance of new permits while allowing permittees

to transfer their permits to others. M.C.O. 100-50-3-a (1992).

The 1992 ordinance created a downward-floating cap; the cap could never increase but could decrease if a permittee chose not to renew a permit or if the City revoked a permit. The combination of the cap and the transferability of permits created a secondary market, and the value of permits has risen steadily. Plaintiffs collectively own 162 taxicab vehicle permits only 6 of which were obtained directly from the City. Plaintiffs purchased the other permits paying as much as $150,000 for them.

In September 2011, several would-be cab drivers challenged the cap in state court, and Judge Jane Carroll found that the cap violated the Wisconsin Constitution because the City did not establish a rational basis for it. In May 2013, Judge Carroll enjoined the City from enforcing the cap but stayed her order pending appeal. In the meantime, the City again amended the taxicab ordinance, increasing the cap by 100 vehicle permits. The ordinance took effect on February 1, 2014, and approximately 1,700 drivers applied for the 100 new permits. Later in February, the City voluntarily dismissed its appeal of Judge Carroll's decision.

Also in February 2014, a number of long-standing permittees (including the plaintiffs in the present case) challenged the cap increase in federal court alleging that it violated the equal protection and due process clauses of the United States Constitution. In March 2014, Judge Charles Clevert, Jr. denied the plaintiffs' request for a preliminary injunction finding that they had not shown that they would suffer irreparable harm or that they were likely to succeed on the merits. The plaintiffs then voluntarily dismissed the case.

Meanwhile, a new type of taxi service began operating in Milwaukee outside of the permit process. Companies such as Uber and Lyft ("network companies") connect

passengers with drivers through a smartphone app. The parties agree on a price via the app, and the driver then takes the passenger to her destination.

In July 2014, in the face of Judge Carroll's decision and the arrival of the network companies, the City adopted yet another new ordinance, this one regulating network companies and eliminating the cap on taxicab vehicle permits altogether. The ordinance took effect on September 1, 2014, and it is this ordinance that plaintiffs contest.

## II. Discussion

On September 3, I held a hearing and the City clarified that under the ordinance a traditional taxicab could also operate as a "network vehicle" (1) if it "operat[ed] under contract service" and (2) if such service was "arranged through a network company." M.C.O. 100-3-14 (2014). "Contract service" means that the transportation is arranged "for a fixed fare by agreement prior to entry of the passenger" into the vehicle, M.C.O. 100-3-2 (2014), and "network company" is defined as a transportation company "that uses an online, digital or electronic platform" to connect passengers and vehicles, M.C.O. 100-3-13 (2014). Thus, as long as a passenger agrees in advance to a fixed fare and the agreement is reached via an electronic or online platform, like a smartphone app, any permittee can operate as a network vehicle. Thus, a taxi can operate as both a network vehicle and a traditional metered fare cab depending on how it contracts for the fare. Based on this clarification, plaintiffs dropped their contention that the new ordinance was unconstitutionally vague.

Plaintiffs continue to seek injunctive relief based on their contention that the new ordinance violates substantive due process and equal protection. A plaintiff seeking a preliminary injunction must establish that: (1) she is likely to succeed on the merits and (2)

3

no adequate remedy exists at law and she will suffer irreparable harm if a preliminary injunction is denied. *Ezell v. City of Chi.*, 651 F.3d 684, 694 (7th Cir. 2011). If this burden is met, then I must weigh the factors against one another and assess whether "the balance of harms favors the moving party or whether the harm to the nonmoving party or the public is sufficiently weighty that the injunction should be denied." *Id*; *see also Christian Legal Soc'y v. Walker*, 453 F.3d 853, 859 (7th Cir. 2006) ("If the moving party meets this threshold burden, the district court weighs the factors against one another in a sliding scale analysis.")

**A. Likelihood of Success on the Merits**

    **1. Substantive Due Process**

Plaintiffs allege that removing the cap on the number of permits violates their right to substantive due process. The Fourteenth Amendment bars a state from depriving a person of property without due process of law. In order to prevail, plaintiffs must establish that they have a constitutionally protected property interest. *Minneapolis Taxi Owners Coal., Inc. v. City of Minneapolis*, 572 F.3d 502, 510 (8th Cir. 2009). Additionally, plaintiffs must show that the City had no rational basis for removing the cap. *Goodpaster v. City of Indianapolis*, 736 F.3d 1060, 1070–71 (7th Cir. 2013).[1]

Plaintiffs contend that they have a property interest in the secondary market value of their vehicle permits and when the City removed the cap, it devalued their permits and unlawfully deprived them of this property interest. The City contends that while permittees

---

[1] The parties agree that owning and being able to sell a taxicab permit is not a fundamental right and that, therefore, rational basis is the proper level of scrutiny. *See Goodpaster*, 736 F.3d at 1070–71.

may have a property interest in the permit itself, they do not have a constitutionally protected property interest in the value of the permit on the secondary market. The City asserts that to confer a property interest, the law must entitle a person to a benefit and not merely provide an expectation of one. *See Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972). In any case, at this stage of the proceeding, I need not decide whether permittees have a constitutionally protected property interest in the value of their permits on the secondary market because even if plaintiffs have such an interest, they are unlikely to be able to establish that the City lacked a rational basis for removing the cap.

Under rational basis scrutiny, in order to be valid the ordinance must merely bear a rational relationship to a legitimate governmental purpose. *Goodpaster*, 736 F.3d at 1070–71(citing *Eby-Brown Co., LLC v. Wis. Dep't of Agric.*, 295 F.3d 749, 754 (7th Cir. 2002). In other words, the ordinance is valid unless it is arbitrary or irrational. *Contreras v. City of Chi.*, 119 F.3d 1286, 1294 (7th Cir. 1997). Additionally, any rational basis for the ordinance is sufficient whether or not it actually motivated the legislature. *Goodpaster*, 736 F.3d at 1071. Plaintiffs must "'negate every conceivable basis which might support'" the ordinance. *Fed. Commc'ns Comm'n, Inc. v. Beach Commc'ns, Inc.*, 508 U.S. 307, 315 (1993) (quoting *Lehnhausen v. Lake Shore Auto Parts Co.*, 410 U.S. 356, 364 (1973)).

The City offers several justifications for removing the cap. First, it was faced with new companies like Uber and Lyft that were redefining the way that taxicab services operated in Milwaukee and were entirely unregulated. In the City's view, in order to regulate these companies, the City had to significantly expand the number of available vehicle permits. Second, when the City increased the number of available permits by 100

5

in February 2014, it realized that there was a significant demand for such permits, much greater than it initially contemplated. Third, the City wished to increase the availability and accessibility of cost-effective transportation. Fourth, the City was under a state court order to remove the cap. Any one of these reasons would likely provide a rational basis for removing the cap. Taken together, however, they offer a compelling justification for the City's reworking of its taxicab regulations. Thus, plaintiffs are unlikely to be able to establish that the City's removal of the cap was irrational.

### 2. Equal Protection

Plaintiffs also argue that the new ordinance regulates network vehicles differently than traditional taxicabs in violation of the equal protection clause. Plaintiffs are not members of a protected class entitled to an elevated level of scrutiny; therefore the ordinance must merely survive rational basis scrutiny. *Fed. Commc'ns Comm'n*, 508 U.S. at 313 ("[A] statutory classification that neither proceeds along suspect lines nor infringes fundamental constitutional rights must be upheld against an equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification."). Just as in the substantive due process analysis, ordinances bear a strong presumption of validity under rational basis review, and it is irrelevant whether the reasons put forward to support the law or ordinance actually motivated the legislature. *Id.* at 314–15. Further, under rational basis review, an ordinance need not be universally effective or meet a standard of mathematical exactitude. *Scariano v. Justices of Supreme Court of State of Ind.*, 38 F.3d 920, 925 (7th Cir. 1994).

The City regulates network vehicles and traditional meter fare taxicabs differently in three respects: fare, vehicle appearance, and provision of information about how a

customer can complain. First, the ordinance regulates fares differently depending on whether a vehicle is operating as a network vehicle or a traditional taxicab. In the latter instance, the driver must charge a meter fare which is set by the ordinance. M.C.O. 100-52-2 (2014). A vehicle operating as a network vehicle, however, may charge whatever the market will bear. As discussed, any vehicle with a taxicab permit may operate as a network vehicle as long as the passenger agrees to a fixed fare ahead of time via an electronic or online communication. There appears to be a rational basis for allowing different fares depending on the manner in which a passenger contracts for service. When a person uses a smartphone app to negotiate a price, the passenger and driver reach an agreement before the passenger enters the vehicle. Also, the requirement that the fixed price be contracted electronically ensures the existence of a record of the agreement. Thus, in the event of a dispute, the combination of the pre-ride fixed price agreement and the electronic record of the agreement protects consumers. In contrast, when a consumer hails a cab on the street or calls a cab by telephone, she is not similarly protected. Even if a passenger and driver orally agreed on a fixed price before the ride began, there would be no record of that agreement. Thus, metered fares are still needed to protect consumers in certain situations.

The second way in which the City regulates network vehicles differently than traditional taxis has to do with vehicle appearance requirements. Traditional taxis must be painted a certain color, M.C.O. 100-51.5-3 (2014), and must display the word "Milwaukee," its permit number, the permittee's name and other information. M.C.O. 100-51.5-1-c-1 (2014). Network vehicles are exempt from these requirements. The City states that visible markings enable prospective passengers hailing a cab to identify a vehicle as a licensed

taxi. This encourages the use of cabs and promotes confidence and public safety. Visible markings, however, are unnecessary when a passenger arranges a ride via a smartphone app. This is so because most passengers using network companies have an ongoing relationship with the company and because passengers are aware that the company will connect them with a network driver. Thus, the visual markings are not needed to signal to the passenger that the vehicle is licensed. Plaintiffs provide no specific argument as to why the distinction the City makes is flawed and seem unlikely to be able to establish that exempting network vehicles from visual marking requirements is irrational.

The third regulatory distinction that the City makes concerns communicating information to passengers about making a complaint. Traditional taxicabs must display a placard informing passengers how to complain. M.C.O. 100.51.5-1-e (2014). Network vehicles, however, must provide complaint information when a passenger contracts for service. M.C.O. 100-51.5-1-f (2014). Again, plaintiffs make no specific argument as to why this distinction is irrational, and I can think of none. If a passenger hails a cab, the obvious way to ensure that she has complaint information is by displaying it in the vehicle. When a passenger contracts for service electronically ahead of time, however, it makes sense to also convey the complaint information electronically.

Thus, plaintiffs are unlikely to be able to establish that the differences between the City's regulation of traditional taxicabs and network vehicles are irrational.

**B. Irreparable Harm**

Even if plaintiffs could show a likelihood of success on the merits, they would also have to establish the absence of an adequate remedy at law and irreparable harm if the preliminary injunction is denied. *Ezell*, 651 F.3d at 694. Plaintiffs argue that the new

8

ordinance will diminish the value of their vehicle permits in the secondary market, and that they will lose revenue to network companies and new permittees and possibly go out of business. Even assuming that plaintiffs have a constitutionally protected property interest in the value of their permits on the secondary market, plaintiffs would have a legal remedy for the possible devaluation of such permits. The value of plaintiffs' permits prior to the effective date of the ordinance could be easily calculated as could their value after removal of the cap. Thus, plaintiffs would be able to recover damages for their loss. Lost revenue to competitors and being forced out of business, however, may be more difficult to redress with damages. *See Cavel Int'l, Inc. v. Madigan*, 500 F.3d 544, 546 (7th Cir. 2007) (referring to "the uncompensated death of [a] business" as "serious irreparable harm"). Thus, plaintiffs may suffer some irreparable harm.

## C. Balancing of Harms

Because plaintiffs have not established a likelihood of success on the merits, I need not balance plaintiffs' and the City's respective harms. *See Ezell* at 694. Nevertheless, I will do so in order to provide a complete analysis. Thus, I consider whether the respective harms "weigh in favor of the moving party or whether the nonmoving party or public interest will be harmed sufficiently that the injunction should be denied." *Christian Legal Soc'y*, 453 F.3d at 859. The analysis is based on a sliding scale: "the greater the moving party's likelihood of success on the merits, the less heavily the balance of harms must weigh in its favor, and vice versa." *In re A&F Enterprises, Inc. II*, 742 F.3d 763, 766 (7th Cir. 2014). Because plaintiffs are not likely to succeed on the merits, to obtain an injunction the balance of harms must weigh heavily in their favor. I conclude that it does not.

As discussed, the potential irreparable harm to plaintiffs if I do not issue an

injunction and it turns out that the ordinance is unconstitutional is lost revenue and possible loss of their businesses. While these would be serious harms, the City and the public, whose interests are virtually identical, would also be harmed were I to mistakenly issue an injunction. Plaintiffs' argument that there will be no real harm to the public because an injunction will simply maintain the status quo is unpersuasive. First, prior to the new ordinance, network companies operated unregulated. Regulating such companies, like regulating traditional taxicabs, is in the public interest. And, the apparent success of such companies indicates a substantial demand for their services. Second, prior to the new ordinance, the City had not complied with a state court decision that the cap on permits contravened the state constitution. It is undesirable to place the City under conflicting orders from state and federal courts. Third, prior to the new ordinance, there was a substantial demand for taxicab permits which were capped at a number lower than in 1992. It is not in the public interest for qualified individuals who seek such permits not to be able to obtain them. For these reasons I find that granting an injunction would be harmful to the City and the public.

### III. Conclusion

For the foregoing reasons,

**IT IS ORDERED** that plaintiffs' Motion for a Preliminary Injunction (ECF No. 2) is **DENIED**.

**IT IS FURTHER ORDERED** that a telephonic status conference will be held on **September 22, 2014 at 11:30 a.m.** The court will initiate the call. Counsel should call

414/297-1285 to advise of their participation.

Dated at Milwaukee, Wisconsin, this 12th day of September, 2014.

s/ Lynn Adelman
_____
LYNN ADELMAN
District Judge