UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN
_____

JOE SANFELIPPO CABS INC., et al.,
        Plaintiffs,

v.                                                                       Case No. 14-cv-1036

CITY OF MILWAUKEE,
        Defendant,

and JATINDER CHEEMA and SAAD MALIK,
        Intervenor-defendants.
_____

## DECISION AND ORDER

Plaintiffs, taxicab companies and owners of City of Milwaukee taxicab permits, challenge the constitutionality of a 2014 City ordinance that removed the cap on the number of permits that the City could issue. Several taxicab drivers have intervened on the side of the City. The City and the intervenors now move to dismiss plaintiffs' complaint.

### I. Background

The City of Milwaukee has regulated the taxicab industry for decades. In 1992, it enacted an ordinance barring the issuance of new permits but allowing transfer of previously issued permits. M.C.O. § 100-50-3-a (1992). That ordinance created a downward-floating cap; the cap could not increase because the City did not issue new permits, but it decreased when a permittee chose not to renew or when a permit was revoked. The ordinance thus created a market for permits, and since then the value of a permit has risen steadily. Plaintiffs collectively own 162 permits, only 6 of which they obtained directly from the City. Plaintiffs purchased the others, paying as much as $150,000 for a permit.

In 2011, several individuals including the present intervenors successfully challenged the cap under the state constitution in state court. In response, the City increased the cap by 100 permits. Approximately 1,700 drivers applied for the 100 new permits. In addition, rideshare companies like Uber and Lyft, which connect passengers with drivers through a smartphone app, had begun to operate outside the permit system. Faced with the state court decision, the great demand for permits, and the activity of the rideshare companies, the City enacted the 2014 ordinance which both removed the cap and established regulations governing the rideshare companies. The removal of the cap allegedly destroyed the value of the permits in the commercial market.

Plaintiffs then commenced the present action. They originally argued that the new ordinance violated substantive due process and equal protection but subsequently amended their complaint and now allege that the ordinance violates the Takings Clause of the Fifth Amendment. They also bring supplemental state law claims.

## II. Discussion

I apply the same standard to defendant's motion for judgment on the pleadings under Fed. R. Civ. P. 12(c) and to intervenors' motion to dismiss under Rule 12(b)(6). *Adams v. City of Indianapolis*, 742 F.3d 720, 727–28 (7th Cir. 2014). To survive defendants' motions, plaintiffs must "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). I accept the complaint's factual allegations as true, but allegations in the form of legal conclusions are insufficient. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

**A. Takings Clause Claim**

The Fifth Amendment provides that "private property [shall not] be taken for public use, without just compensation." To allege a Takings Clause claim, plaintiffs must plead that (1) they have a property interest protected by the Fifth Amendment, (2) the 2014 ordinance effected a taking of that interest, (3) the taking was for public use, and (4) the state did not provide just compensation.[1] *See Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1000–01 (1984).

I first ask whether plaintiffs possess a protected property interest. Property interests "are created and their dimensions are defined by existing rules or understandings;" in other words, plaintiffs must plead "rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972). A protected interest can arise from state law or a mutually explicit understanding. *Dennis Melancon, Inc. v. City of New Orleans*, 703 F.3d 262, 274 (5th Cir. 2012). Plaintiffs must show more than an abstract need or desire or a unilateral expectation; rather, they must have a legitimate claim of entitlement. *Roth*, 408 U.S. at 577. Those with a legitimate claim of entitlement to property exercise certain rights of control over such property. *Members of Peanut Quota Holders Ass'n, Inc. v. U.S.*, 421 F.3d 1323, 1330 (Fed. Cir. 2005).

The issue presented is whether whatever interest plaintiffs have in their permits

---

[1] Before a Takings Clause claim is ripe, plaintiffs must seek and be denied compensation from the state. *Rockstead v. City of Crystal Lake*, 486 F.3d 963, 965 (7th Cir. 2007). A Wisconsin claimant must file a notice of claim pursuant to Wis. Stat. § 893.80(1d)(a). Similarly, plaintiffs had to file notice of their state law claims. Plaintiffs may not have strictly complied with the statute, but defendant had actual notice of the claims and declined to pay them. Thus, I will address the claims' merits. *See Bostco LLC v. Milwaukee Metro. Sewage Dist.*, 350 Wis. 2d 554, 608 (2013).

3

includes a property interest in the value of the permits in the commercial market. *See Minneapolis Taxi Owners Coal., Inc. v. City of Minneapolis*, 572 F.3d 502, 507 (8th Cir. 2009) (noting that plaintiffs' claim is that "removing the cap on the number of licenses destroyed the market value of the licenses"). Plaintiffs contend that they have such an interest because the City guaranteed that the cap created by the 1992 ordinance would never be removed. Plaintiffs cite the phrase in the ordinance that "no new passenger vehicle permits for taxicabs may be issued," 1992 statements by aldermen that the ordinance was intended to create "a property right in a public sense," and City employees' representations that the City would no longer issue permits. Plaintiffs contend that the above language, statements and representations created an understanding with the City that they had a protected property right in the value of the permits. Am. Compl. at 1–2 (ECF No. 22).

I conclude that plaintiffs' allegations fail to support the proposition that a property interest in the value of the permits was created. *See Minneapolis Tax Owners Coal.*, 572 F.3d at 509 ("[A]ny property interest that [ ] taxicab-license holders' may possess does not extend to the market value of the taxicab licenses derived through the closed nature of the City's taxicab market."). Plaintiffs voluntarily entered the taxicab market, a highly regulated industry, knowing that their ability to operate a taxicab was subject to government control. *See Dennis Melancon*, 703 F.3d at 272 ("[A] protected property interest simply cannot arise in an area voluntarily entered into . . . which, from the start, is subject to pervasive Government control, because the government's ability to regulate the area means an individual cannot be said to possess the right to exclude."); *see also Goodpaster v. City of*

4

*Indianapolis*, 736 F.3d 1060, 1074 (7th Cir. 2013) (stating that those involved in regulated businesses should not be surprised when ordinances change and negatively affect their business); *Minneapolis Taxi Owners Coal.*, 572 F.3d at 509 (noting that "in the case of personal property, by reason of the State's traditionally high degree of control over commercial dealings, [a property owner] ought to be aware of the possibility that new regulation might even render his property economically worthless" and that this is especially true in highly regulated markets) (quoting *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1029 (1992)).

Whatever interest plaintiffs have in their permits is the product of a regulatory scheme that vested the City with broad discretion to control and even extinguish that interest, *see, e.g.*, M.C.O. § 100-50-9 (1992) (permitting the City to deny permits under certain circumstances); § 100-50-15 (vesting the common council with authority to revoke or suspend permits for cause); § 100-51.5-1 (outlining vehicle standards and equipment requirements for vehicles operated under a taxicab permit), including the discretion to change the regulatory framework. *Dennis Melancon*, 703 F.3d at 274. Thus, because the City has always maintained control over the permits, plaintiffs at best had a unilateral expectation that the City would not diminish the market value of the permits. *Id.*

The argument that the language of the ordinance together with selected statements of City representatives amounted to an irrevocable promise that the City would never issue another taxicab permit or amend its transportation regulations so as to devalue taxicab permits in the commercial market is without merit. "A statute is not a commitment by the legislature never to repeal the statute." *Pittman v. Chi. Bd. of Educ.*, 64 F.3d 1098, 1104

5

(7th Cir. 1995); *see also Olson v. State Conservation Comm'n*, 235 Wis. 473 (1940) (explaining that the power to legislate "carries with it the further power to change existing laws, including regulation and prohibition, to meet changing conditions, and this power is not lost simply because those affected have been licensed to operate under and by virtue of the conditions of prior laws"). "To treat statutes as contracts would enormously curtail the operation of democratic government. Statutes would be ratchets, creating rights that could never be retracted or modified without buying off the groups upon which these rights had been conferred." *Pittman*, 64 F.3d at 1104.

Nothing in plaintiffs' complaint indicates that the City intended the 1992 ordinance to be anything more than a typical ordinance, subject to amendment or repeal at any time. The ordinance did not state that the City could never modify or repeal it, and plaintiffs point to no statements by a City representative to that effect.[2] *Dennis Melancon*, 703 F.3d at 274 (concluding that "isolated . . . evidence that purportedly suggests the development of custom by which the City treated [taxicab permits] as property . . . is insufficient to establish the type of mutually explicit understanding necessary to create a protectable property right

---

[2] In fact, aldermen warned that the legislation could be changed in the future. *See* Laing Decl. Ex. B at 14 (ECF No. 4-2) (Alderman Nardelli stating "The passage of this substitute ordinance would not preclude [new permits from being issued in the future]. Anything can happen with regard to legislation."); *id.* at 22 (Alderman Nardelli stating "And, again, it's not something that we could not revisit. It just provides right now try this out."); *id.* at 35 (Alderman Kalwitz stating "And we're creating something that may not be permanent . . . we say we're going to give this a try for a year or two, . . . I would sell those permits in the next year or two, because after that . . . it's not going to be worth anything."). I may consider the above-cited statements. *Bogie v. Rosenberg*, 705 F.3d 603, 609 (7th Cir. 2013) ("In considering a motion to dismiss under Rule 12(b)(6), district courts are free to consider . . . exhibits attached to the complaint, Fed. R. Civ. P. 10(c), or documents referenced in the pleadings if they are central to the claim.").

6

under the Takings Clause"). Thus, I conclude that plaintiffs plead no more than a unilateral expectation that the market value of their permits would be maintained. They do not plead the existence of a protected property interest and thus fail to state a Takings Clause claim.

Even assuming that plaintiffs have a property interest in their permits, to survive the motions to dismiss, plaintiffs must also plead that a taking occurred. The Takings Clause encompasses four categories of takings claims: permanent physical invasion, deprivation of all beneficial economic use, exactions, and partial regulatory takings. *Goodpaster*, 736 F.3d at 1073–74 (citing *Lingle v. Chevron U.S.A., Inc.*, 544 U.S. 528, 538–39 (2005)). The present case falls into the partial regulatory takings category, and thus, I consider: (1) the nature of the government action, (2) the economic impact of the regulation, and (3) the degree of interference with plaintiffs' reasonable investment-backed expectations. *Id*. at 1074. There is no "set formula" for determining whether a taking has occurred; rather, these factors are "designed to bar Government from forcing some people alone to bear public burdens which, in fairness and justice, should be borne by the public as a whole." *Penn Cent. Transp. Co. v. City of N.Y.*, 438 U.S. 104, 123–34 (1978).

I conclude that plaintiffs also fail to plausibly plead that they have been subject to a taking. Contrary to plaintiffs' assertion, the ordinance did not completely destroy all beneficial economic use of their permits. While it eliminated the commercial value of the permits, it did not interfere with plaintiffs' right to use the permits to operate taxis or to transfer the permits. Also, the ordinance was at least in part designed to enable the City to continue to effectively regulate the industry. *See Lingle*, 544 U.S. at 539 (stating that "whether [the government action] amounts to a physical invasion or instead merely affects property interests through some public program adjusting the benefits and burdens of

7

economic life to promote the common good" is relevant to determining whether a taking occurred); *see also Lucas*, 505 U.S. at 1014 (noting that property may be regulated and that a regulation only constitutes a taking if it "goes too far") (internal quotations and citation omitted). These facts weigh "heavily against finding a taking." *Goodpaster*, 736 F.3d at 1074–75. And as noted above, the highly-regulated nature of the taxicab industry and the fact that plaintiffs should have been aware of the possibility of future changes to the regulations make any expectation that the City would not remove the taxicab permit cap unreasonable and one-sided. *See Bos. Taxi Owners Ass'n, Inc. v. City of Bos.*, 84 F. Supp. 3d 72, 79–80 (D. Mass. 2015).

Therefore, plaintiffs fail to plausibly plead both that they have a protected property interest in the market value of their permits and that the 2014 ordinance went so far as to constitute a taking. Thus, I will dismiss plaintiffs' Takings Clause claim.

**B. State Law Claims**

Plaintiffs also allege supplemental state law breach of contract, promissory estoppel, and equitable estoppel claims. Because I have dismissed plaintiffs' only federal cause of action, I need not retain jurisdiction over plaintiffs' state law claims. *See* 28 U.S.C. § 1367(c)(3) ("The district court[] may decline to exercise supplemental jurisdiction over a claim . . . if . . . [it] has dismissed all claims over which it has original jurisdiction."). In the present case, however, it appears that my analysis of plaintiffs' Takings Clause claim disposes of plaintiffs' state law claims as well. Therefore, in the interest of efficiency, I will address them.

First, plaintiffs fail to plead a breach of contract claim. Plaintiffs allege that the

8

Case 2:14-cv-01036-LA   Filed 12/07/15   Page 8 of 9   Document 43

ordinance constituted a contract between the City and plaintiffs. However, as noted above, an ordinance is not a contract, and the isolated statements plaintiffs cite in support of their assertion that the 2014 ordinance constituted an agreement between the City and permit-holders are insufficient to turn the ordinance into some sort of forever-binding agreement. *Pittman*, 64 F.3d at 1104; *Olson*, 235 Wis. 473.

Plaintiffs' promissory and equitable estoppel claims fail for the same reason. Plaintiffs allege that the ordinance together with statements by City representatives constituted a promise to maintain the cap system in perpetuity, and that this promise induced plaintiffs to pay market rate for the permits. As noted, however, ordinances, even if accompanied by statements from City officials, cannot bind future legislatures from amending or repealing them in reaction to economic and social changes. *Flynn v. Dep't of Admin.*, 216 Wis. 2d 521, 556 (1998) ("Because one legislature may not bind future legislatures, it is fully within the legislature's power to change an appropriation put into place by a previous legislative session."). And plaintiffs should have been aware that, in such a heavily-regulated industry, the ordinances would be subject to future change.

### III. Conclusion

**THEREFORE, IT IS ORDERED** that intervenor's motion to dismiss (ECF No. 33) and defendant's motion for judgment on the pleadings (ECF No. 37) are **GRANTED**. The Clerk shall enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 7th day of December, 2015.

s/ Lynn Adelman
_____
LYNN ADELMAN
District Judge

9

Case 2:14-cv-01036-LA   Filed 12/07/15   Page 9 of 9   Document 43